NEW LONDON COUNTY MUTUAL INSURANCE
COMPANY *v.* MARIA V. NANTES ET AL.
(SC 18758)
(SC 18759)

Rogers, C. J., and Norcott, Palmer, Zarella, McLachlan,
Eveleigh and Harper, Js.

Argued September 19, 2011—officially released February 21, 2012

*Edwin L. Doernberger*, with whom was *David G. Jordan*, for the appellants (named defendant et al.).

*Allan B. Taylor*, with whom were *Martin J. Magnusson* and, on the brief, *James H. Rotondo*, for the appellee (plaintiff).

*Opinion*

PALMER, J. Two houseguests suffered serious injuries after their host left her car running overnight in an attached garage and the house filled with carbon monoxide. The principal issue in this appeal is whether the guests' injuries are covered by a homeowner's insurance policy issued by the plaintiff, New London County

Mutual Insurance Company, to the named defendant, Maria V. Nantes, that excludes coverage for injuries "[a]rising out of . . . [t]he . . . use" of a motor vehicle. The plaintiff brought this declaratory judgment action against Nantes, the homeowner, her guests, Armenui Dzhgalian and Aida Melikyan, and Nantes' automobile insurer, Government Employees Insurance Company (GEICO),[1] seeking a declaration that Nantes' homeowner's policy does not cover the injuries suffered by Dzhgalian and Melikyan. The plaintiff filed a motion for summary judgment, claiming that the policy does not cover these injuries because they fall within the policy exclusion for injuries "[a]rising out of . . . [t]he . . . use" of a motor vehicle. The trial court granted the plaintiff's motion and rendered judgment for the plaintiff, and the defendants appealed.[2] We affirm the judgment of the trial court.

The following undisputed facts and procedural history are relevant to our disposition of this appeal. Dzhgalian and Melikyan are medical school graduates and residents of California. In February, 2007, they traveled to Connecticut to participate in a month long, unpaid internship at Griffin Hospital (hospital) in the town of Derby. During their internships, Dzhgalian and Melikyan lived with Nantes, a hospital employee, at her home in the town of Ansonia. As part of the living arrangement, Nantes drove Dzhgalian and Melikyan to and from the hospital each day. Dzhgalian and Melikyan each agreed to pay Nantes $460 to cover their share of utilities and car expenses.

[1] Although a defendant, GEICO did not participate in this appeal. We hereinafter refer to Nantes, Dzhgalian and Melikyan collectively as the defendants.

[2] The defendants appealed to the Appellate Court from the judgment of the trial court, and the appeal was transferred to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.

The defendants also filed a separate appeal, which raises no new issues and which was consolidated with their first appeal and transferred to this court.

At the end of the work day on February 12, 2007, Nantes drove Dzhgalian and Melikyan to her house and parked her car in the attached garage. Nantes exited the car without turning off the engine, closed the garage door, and went into the living quarters of the house, which did not contain a carbon monoxide detector. The car's engine continued to run overnight, and the house filled with carbon monoxide. Dzhgalian and Melikyan suffered serious neurological injuries from carbon monoxide poisoning. They suffered additional injuries when Nantes dragged them, unconscious, out of the house.[3]

Several days later, the plaintiff received claims from Nantes for Dzhgalian's and Melikyan's medical expenses. The plaintiff promptly disclaimed coverage, relying mainly on the fact that Nantes' homeowner's policy contained the following exclusion: "[c]overage [for] [p]ersonal [l]iability and . . . [m]edical [p]ayments to [o]thers do[es] not apply to 'bodily injury' or 'property damage' . . . [a]rising out of . . . [t]he ownership, maintenance, use, loading or unloading of motor vehicles or all other motorized land conveyances, including trailers, owned or operated by or rented or loaned to an 'insured' . . . ." Soon thereafter, Dzhgalian and Melikyan returned to California. Nantes subsequently relocated to California as well.

Dzhgalian and Melikyan then brought an action against Nantes in California state court to recover for their injuries. In February, 2008, they reached a settlement pursuant to which Nantes assigned Dzhgalian and Melikyan her rights under the homeowner's policy for the amount of any damages that Dzhgalian and Melikyan

---

[3] We note that, although the defendants alleged in their motion to strike and in their brief to this court that Melikyan also sustained bodily injuries due to being dragged out of the house, the record is unclear as to whether Melikyan sustained such injuries or whether she had been dragged out of the house. For purposes of this appeal, we assume that Melikyan sustained injuries as a result of being dragged out of the house by Nantes.

might recover against her. Nantes also assigned Dzhgalian and Melikyan her right to recover for the plaintiff's alleged bad faith in declining to settle within the policy limits. Nantes retained the right to recover nonassignable benefits under the policy, including her right to recover for emotional distress and punitive damages against the plaintiff. All parties agreed to waive their right to a jury trial on the issue of Dzhgalian's and Melikyan's damages and to submit that issue instead to binding arbitration in California, a proceeding in which Nantes would have the right but not the obligation to testify and present evidence. Nantes also agreed not to oppose Dzhgalian and Melikyan's application to confirm the arbitration award. In return, Dzhgalian and Melikyan agreed that they would not execute on any judgment against Nantes personally and would seek to recover only from the plaintiff. Pursuant to the settlement agreement, the defendants stipulated that, after the arbitration award was confirmed and judgment was rendered thereon, Dzhgalian and Melikyan would file a direct action against the plaintiff in California to enforce their rights as Nantes' assignees. Nantes agreed that she would testify in the action. The settlement agreement also provided that Nantes would have the right to join the action "to prosecute her rights to recover on her nonassignable rights under the homeowner's policy, such as damages for emotional distress and for punitive damages against [the plaintiff]."[4]

In June, 2008, before arbitration had commenced, the plaintiff filed this declaratory judgment action against the defendants. Relying primarily on the motor vehicle exclusion, the plaintiff sought a declaration that Nantes' homeowner's policy does not cover Dzhgalian's and Melikyan's injuries. On August 4, 2008, the defendants

---

[4] GEICO, which also was a party to the settlement, agreed to pay Dzhgalian and Melikyan each $100,000, the policy limit on Nantes' automobile insurance policy with GEICO.

filed a motion to dismiss the action, claiming, inter alia, that the court lacked personal jurisdiction over Dzhgalian and Melikyan under Connecticut's long arm statute, General Statutes § 52-59b.[5] The trial court, *Hon. George W. Ripley II*, judge trial referee, denied the motion to dismiss in part, concluding that Dzhgalian and Melikyan had transacted business in Connecticut and therefore were subject to the court's jurisdiction.[6]

[5] General Statutes § 52-59b provides in relevant part: "(a) As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident individual . . . who in person or through an agent: (1) [t]ransacts any business within the state . . . ."

[6] The trial court concluded that, although Melikyan was subject to personal jurisdiction in Connecticut, she nevertheless was not properly served because the summons contained an incorrect address. The trial court thus dismissed the action as to Melikyan without prejudice for lack of jurisdiction. The court subsequently granted the plaintiff's request for leave to amend the summons.

On August 8, 2008, counsel for Dzhgalian and Melikyan notified the plaintiff that arbitration would begin on August 13, 2008. On August 13, 2008, the plaintiff's attorney notified the arbitrator by letter that the plaintiff would not appear at the hearing. In the letter, the plaintiff's attorney denied that the plaintiff had received "adequate notice" of the arbitration and reaffirmed the plaintiff's position that it was not obligated to provide Nantes with a defense or indemnification. The plaintiff's attorney also noted that "[i]t . . . is questionable whether [the] arbitration is intended to resolve matters among adversarial parties. Instead, it appears to be designed to achieve a collusive judgment against . . . Nantes in an effort to enforce it against [the plaintiff] in a California court, notwithstanding the pending declaratory judgment action in . . . Connecticut." The arbitration proceeded without the plaintiff, and the arbitrator awarded Dzhgalian and Melikyan more than $11 million each. Following the arbitration, Nantes, Dzhgalian, and Melikyan brought an action in California seeking "to make [the plaintiff] perform its alleged obligation to cover for [Nantes'] liability. [The defendants] assert[ed] that [the plaintiff's] refusal to provide coverage for Nantes constituted breach of its duty of good faith and fair dealing to Nantes." *Nantes* v. *New London County Mutual Ins. Co.*, United States District Court, Docket No. 2:09-cv-07161-RGK-JC (C.D. Cal. February 3, 2010). The United States District Court for the Central District of California dismissed the action for lack of personal jurisdiction over the plaintiff; id.; and the Ninth Circuit Court of Appeals affirmed the judgment of the District Court. *Nantes* v. *New London County Mutual Ins. Co.*, United States Court of Appeals, Docket No. 10-55357 (9th Cir. July 5, 2011).

In November, 2009, the defendants filed a motion to strike the plaintiff's complaint, contending, inter alia, that the complaint constituted a misuse of the declaratory judgment statute, General Statutes § 52-29 (a).[7] The trial court, *Radcliffe, J.*, denied the motion to strike, concluding that the plaintiff's complaint "set forth a proper claim for declaratory relief . . . ." The plaintiff then filed a motion for summary judgment, claiming that Nantes' homeowner's policy does not cover Dzhgalian's and Melikyan's injuries because they fall within the policy's motor vehicle exclusion. The trial court, *Bellis, J.*, agreed with the plaintiff, granted the motion for summary judgment and rendered judgment thereon for the plaintiff. Additional procedural history will be set forth as necessary.

On appeal, the defendants claim that the trial court incorrectly concluded that it had personal jurisdiction over Dzhgalian and Melikyan, that the plaintiff's complaint constituted a proper use of the declaratory judgment statute and that Dzhgalian's and Melikyan's injuries are not covered by Nantes' homeowner's insurance policy. We reject each claim.

I

We first address the defendants' contention that the trial court, *Hon. George W. Ripley*, judge trial referee, incorrectly determined that it had personal jurisdiction over Dzhgalian and Melikyan under § 52-59b (a) (1) upon concluding that they had transacted business in Connecticut and that the plaintiff's cause of action against them arose out of this transaction. Specifically, the defendants challenge the trial court's determination that it had jurisdiction over Dzhgalian and Melikyan

---

[7] General Statutes § 52-29 (a) provides: "The Superior Court in any action or proceeding may declare rights and other legal relations on request for such a declaration, whether or not further relief is or could be claimed. The declaration shall have the force of a final judgment."

because, before entering the state, they had arranged for paid lodging and transportation with Nantes, a stranger to them, and because their one month medical internship with the hospital, "while unpaid, conferred substantial benefits to their careers by providing valuable experience and by fulfilling a prerequisite to their medical licensing . . . ." We conclude that the trial court properly exercised personal jurisdiction over Dzhgalian and Melikyan.

"[A] challenge to the jurisdiction of the court presents a question of law over which our review is plenary." *Ryan* v. *Cerullo*, 282 Conn. 109, 118, 918 A.2d 867 (2007). This court previously has explained that § 52-59b (a) (1) "authorizes jurisdiction over nonresidents who transact any business within the state provided that the cause of action arises out of such transaction." *Bank of Babylon* v. *Quirk*, 192 Conn. 447, 449, 472 A.2d 21 (1984). An individual "[t]ransacts . . . business" in Connecticut under § 52-59b (a) (1) if he or she engages in "a single purposeful business transaction." (Internal quotation marks omitted.) *Ryan* v. *Cerullo*, supra, 119.

We agree with the trial court that Dzhgalian and Melikyan's lodging and transportation arrangement with Nantes constituted a purposeful business transaction within the meaning of § 52-59b (a) (1) and that the plaintiff's cause of action against Dzhgalian and Melikyan arose out of this transaction. Nantes allowed Dzhgalian and Melikyan, two people whom she did not know, to stay in her house for several weeks, and she drove them to and from the hospital each day. In exchange, they each agreed to pay her $460. As a general matter, if a host agrees to provide lodging and transportation to guests previously unknown to her, and the guests agree to provide money in return, the resulting arrangement constitutes a purposeful business transaction. Furthermore, the plaintiff's cause of action against Dzhgalian and Melikyan unquestionably arose from

their participation in the lodging and transportation arrangement. The plaintiff's action seeks a declaration regarding the legal rights that Dzhgalian and Melikyan possess as assignees under Nantes' homeowner's insurance policy. If Dzhgalian and Melikyan possess any such rights, they possess them because of the injuries that they sustained while staying at Nantes' house in Connecticut. Because Dzhgalian and Melikyan were staying at Nantes' house pursuant to the lodging and transportation arrangement, and because the arrangement constituted a business transaction, the plaintiff's cause of action arose from business that Dzhgalian and Melikyan had transacted in Connecticut.[8] We therefore conclude that the trial court correctly determined that it had personal jurisdiction over Dzhgalian and Melikyan.

## II

We next address the defendants' claim that the trial court, *Radcliffe, J.*, improperly denied their motion to strike the plaintiff's complaint. In support of their motion, the defendants claimed that the plaintiff's action was a misuse of the declaratory judgment statute because the complaint did not seek a declaration of the parties' future rights or obligations but instead sought legal vindication of the plaintiff's refusal to provide Nantes with a defense and indemnification in the California arbitration proceeding.[9] The defendants also

[8] The defendants assert that the plaintiff's action did not arise out of the lodging and transportation agreement because Dzhgalian's and Melikyan's injuries did not arise out of a breach of the terms or conditions of that agreement. The defendants cite no authority, and we are aware of none, to support their contention that a cause of action cannot be deemed to arise out of a particular business transaction unless the cause of action involves a claim that a party to the transaction failed to comply with the transaction's contractual terms. Moreover, we see no justification for imposing such a jurisdictional limitation. Accordingly, we reject the defendants' argument.

[9] We note that the plaintiff filed the present declaratory judgment action several months before commencement of the arbitration proceeding in California.

claimed that the plaintiff's action was an improper attempt to deprive the defendants of their choice of forum for a future breach of contract action against the plaintiff. The trial court rejected these arguments, concluding that a bona fide dispute existed between the parties that properly could be resolved by a declaratory judgment. On appeal, the defendants renew the claims that they raised in the trial court. We conclude that the trial court properly denied the defendants' motion to strike.

The standard of review in an appeal of a trial court's ruling on a motion to strike is well established. "A motion to strike challenges the legal sufficiency of a pleading, and, consequently, requires no factual findings by the trial court. As a result, our review of the court's ruling is plenary. . . . We take the facts to be those alleged in the [complaint] . . . and we construe the [complaint] in the manner most favorable to sustaining its legal sufficiency." (Internal quotation marks omitted.) *Lestorti* v. *DeLeo*, 298 Conn. 466, 472, 4 A.3d 269 (2010).

"The purpose of a declaratory judgment action, as authorized by General Statutes § 52-29 and Practice Book § [17-55], is to secure an adjudication of rights [when] there is a substantial question in dispute or a substantial uncertainty of legal relations between the parties." (Internal quotation marks omitted.) *Bysiewicz* v. *DiNardo*, 298 Conn. 748, 756, 6 A.3d 726 (2010). Subdivisions (1) and (2) of Practice Book § 17-55 respectively require that the plaintiff in a declaratory judgment action have "an interest, legal or equitable, by reason of danger of loss or of uncertainty as to the party's rights or other jural relations" and that there be "an actual bona fide and substantial question or issue in dispute or substantial uncertainty of legal relations which requires settlement between the parties . . . ." This court previously has observed that our declaratory

judgment statute "provides a valuable tool by which litigants may resolve uncertainty of legal obligations." (Internal quotation marks omitted.) *Liberty Mutual Ins. Co.* v. *Lone Star Industries, Inc.*, 290 Conn. 767, 812, 967 A.2d 1 (2009).

We also have recognized that our declaratory judgment statute is unusually liberal. "An action for declaratory judgment . . . is a statutory action as broad as it well could be made." (Internal quotation marks omitted.) *Beccia* v. *Waterbury*, 185 Conn. 445, 453, 441 A.2d 131 (1981); accord *Sigal* v. *Wise*, 114 Conn. 297, 301, 158 A. 891 (1932). Indeed, our declaratory judgment statute "is broader in scope than . . . the statutes in most, if not all, other jurisdictions . . . and [w]e have consistently construed our statute and the rules under it in a liberal spirit, in the belief that they serve a sound social purpose. . . . [Although] the declaratory judgment procedure may not be utilized merely to secure advice on the law . . . it may be employed in a justiciable controversy where the interests are adverse, where there is an actual bona fide and substantial question or issue in dispute or substantial uncertainty of legal relations which requires settlement, and where all persons having an interest in the subject matter of the complaint are parties to the action or have reasonable notice thereof." (Citations omitted; internal quotation marks omitted.) *Horton* v. *Meskill*, 172 Conn. 615, 627, 376 A.2d 359 (1977).

One type of controversy to which our declaratory judgment statute often has been applied is a dispute over rights and liabilities under an insurance policy. E.g., *Liberty Mutual Ins. Co.* v. *Lone Star Industries, Inc.*, supra, 290 Conn. 772–73 (declaratory judgment action to determine rights under insurance policy); *Vermont Mutual Ins. Co.* v. *Walukiewicz*, 290 Conn. 582, 584, 966 A.2d 672 (2009) (same); see also *St. Paul Fire & Marine Ins. Co.* v. *Shernow*, 22 Conn. App. 377, 380,

577 A.2d 1093 (1990) ("[t]here is no question that a declaratory judgment action is a suitable vehicle to test the rights and liabilities under an insurance policy").

In the present case, the plaintiff sought an adjudication of its rights with respect to an unsettled question of law pertaining to its liability under the homeowner's insurance policy that it had issued to Nantes. See, e.g., *Bysiewicz* v. *DiNardo*, supra, 298 Conn. 756. By its terms, the complaint sought to resolve uncertainty concerning the issue of whether the plaintiff owed Nantes and her assignees a legal duty under that policy, an issue about which the complaint alleged ample dispute. Indeed, on the basis of an express provision in the defendants' settlement agreement, the complaint alleged that the defendants intended to bring an action against the plaintiff in California on the theory that the plaintiff owed Nantes and her assignees a legal duty under Nantes' policy. As the defendants acknowledged in their brief to this court, the settlement agreement "demonstrated the intent of . . . Melikyan and Dzhgalian to pursue legal action against [the plaintiff], upon the anticipated attainment of an award in arbitration." A clearer case of an actual bona fide issue in dispute would be difficult to imagine.

We therefore find no merit in the defendants' assertion that the complaint was improper because it sought an "advisory . . . ruling" rather than remedial or prospective relief.[10] As we explained, the plaintiff sought a declaration that it owed no continuing contractual duty to Nantes or her assignees. Such a declaration

---

[10] In support of their contention that the plaintiff's complaint improperly had sought an advisory opinion, the defendants appear to suggest that an insurer properly may bring a declaratory judgment action to ascertain coverage under an insurance policy only if the insurer seeks to determine whether the policy obligates the insurer to provide a defense in an ongoing or imminent legal action against the policyholder. This supposition is without any basis in Connecticut law.

represents the kind of prospective relief contemplated by our declaratory judgment statute because it would insulate the plaintiff against future liability under Nantes' homeowner's insurance policy. It also would protect the plaintiff in the event that Nantes brought an action to recover for bad faith, an action the settlement agreement expressly contemplated that Nantes might bring.[11]

For similar reasons, we also reject the defendants' related contention that the plaintiff's complaint contravened the "traditional function" of a legal action, namely, "to provide a day in court to the party allegedly harmed." In support of this contention, the defendants assert that the plaintiff "has not proclaimed any injury that it has suffered as a consequence of actions undertaken by the defendants, nor has it sought guidance regarding the uncertainty of legal relations with any of the defendants." This assertion lacks merit because, as we explained, the complaint sought expressly to resolve the uncertainty surrounding the plaintiff's contractual obligations to the defendants.

Finally, the defendants contend that the complaint was an "[a]busive" attempt to deprive the " 'true plaintiffs' " of their chosen forum.[12] The defendants assert

[11] The defendants further assert that, "[t]o permit the adjudication of a declaratory action, such as [the present action], would be to enable an insurer to file a declaratory judgment action any time it decide[s] to deny coverage to an insured, thereby creating a cause of action in Connecticut for nonbreach of contract (with the potential of forcing insureds into court to defend actions unnecessarily)." We believe that this assertion is unfounded. Despite the breadth of our declaratory judgment statute, there is no reason to presume that insurance companies would undertake the cost of bringing an action against every policyholder to whom they deny coverage solely for the purpose of preempting future breach of contract actions, and the limited set of Connecticut cases addressing such claims belies the defendants' assertion.

[12] We note that the defendants do not truly challenge the legal sufficiency of the plaintiff's complaint when they contend that the complaint was an "[a]busive" attempt to deprive the " 'true plaintiffs' " of their chosen forum. It is therefore unclear that the proper procedural vehicle for this contention

that the real purpose behind the plaintiff's declaratory judgment action was to avoid defending a breach of contract action in the defendants' preferred forum. This purpose, the defendants maintain, "has been admonished by courts across the country."

The defendants fail to cite a single Connecticut case in support of this argument. Even if there were such a case, we would not be persuaded that the present action is an instance of impermissible forum shopping. The action was brought by a Connecticut insurance company to determine whether a Connecticut homeowner's insurance policy covers injuries that occurred in a Connecticut home. These facts belie the defendants' contention that Connecticut is an inappropriate forum for resolution of the issue presented by the plaintiff's action. Under our law, a forum does not become inappropriate simply because the defendants would prefer to litigate elsewhere or because they would prefer to be the plaintiffs.

### III

We now address the defendants' principal claim, namely, that the trial court, *Bellis, J.*, improperly granted the plaintiff's motion for summary judgment. We reject this claim as well.

The following additional procedural history is relevant to our resolution of the defendants' claim. In granting the plaintiff's summary judgment motion and rendering judgment thereon, the trial court concluded that all of Dzhgalian's and Melikyan's injuries, including the bodily injuries that they sustained while being dragged from the house, arose out of the use of a motor vehicle and therefore fell within the motor vehicle exclusion of Nantes' homeowner's insurance policy.

is a motion to strike. We need not resolve this procedural question, however, because the plaintiff does not raise the question and because the defendants' contention lacks merit by any standard.

The trial court reasoned: "Connecticut precedent demonstrates that the link between *bodily injury* and the *use of a motor vehicle* in the language of the policy lies in the words *arising out of.* Our courts have consistently interpreted 'arising out of' to mean 'was connected with,' 'had its origins in,' 'grew out of,' 'flowed from,' or 'was incident to,' even in the context of motor vehicle exclusions. [Although] Nantes may not have been 'using' the motor vehicle at the time that the injuries were sustained, the court finds that the injuries 'arose out of the use of the motor vehicle' because they were 'connected with,' 'had their origins in,' 'grew out of,' 'flowed from,' or 'were incident to' Nantes' use of the vehicle when she drove the vehicle home." (Emphasis in original.) The trial court also rejected the defendants' alternative contention that, even if Dzhgalian's and Melikyan's injuries did arise out of the use of a motor vehicle, the doctrine of concurrent causes[13] brings their injuries within the scope of coverage. The court rejected this contention on the ground that the common law of this state does not recognize the doctrine of concurrent causes.

On appeal, the defendants advance three arguments in support of their claim that Nantes' policy covers Dzhgalian's and Melikyan's injuries. First, they argue that the injuries that Dzhgalian and Melikyan suffered as a result of the carbon monoxide poisoning do not fall under the policy's motor vehicle exclusion because the injuries did not arise out of the use of a motor vehicle. Second, they contend that, even if those injuries did arise out of the use of a motor vehicle, they fall within the scope of coverage under the doctrine of

[13] As we explain more fully hereinafter, under the independent concurrent cause rule, when an insurance policy insures against loss caused by one risk but excludes loss caused by another risk, coverage is extended to a loss caused by the insured risk even though the excluded risk is a contributory cause.

concurrent causes. Finally, the defendants maintain that the additional injuries that Dzhgalian and Melikyan sustained as a result of being dragged out of the house did not arise out of the use of a motor vehicle and, therefore, do not fall within the motor vehicle exclusion. We reject all of these contentions, which we address in turn.

We first set forth certain well established principles that govern our review of the defendants' arguments. If an insurance policy's words are clear and unambiguous, we must accord them their "natural and ordinary meaning." (Internal quotation marks omitted.) *Galgano* v. *Metropolitan Property & Casualty Ins. Co.*, 267 Conn. 512, 519, 838 A.2d 993 (2004). If, instead, the policy's words are ambiguous, we adopt an interpretation that expands the range of coverage over one that restricts it. See, e.g., id. We note, however, that "words do not become ambiguous simply because lawyers or laymen contend for different meanings." (Internal quotation marks omitted.) *R.T. Vanderbilt Co.* v. *Continental Casualty Co.*, 273 Conn. 448, 463, 870 A.2d 1048 (2005). Words also do not become ambiguous simply because a contract fails to define them; even when undefined, words are not ambiguous if common usage or our case law gives them a single meaning. See *Budris* v. *Allstate Ins. Co.*, 44 Conn. App. 53, 57, 686 A.2d 533 (1996). Finally, the interpretation of an insurance policy presents a question of law that we review de novo. See, e.g., *Auto Glass Express, Inc.* v. *Hanover Ins. Co.*, 293 Conn. 218, 231, 975 A.2d 1266 (2009).

In the present case, we are called on to ascertain the meaning of the phrase, "[a]rising out of" the "use" of "motor vehicles," a phrase that is clear and unambiguous because our case law explicitly defines it. As we observed in *Hogle* v. *Hogle*, 167 Conn. 572, 356 A.2d 172 (1975), "it is generally understood that for liability for an accident or an injury to be said to '*arise out of the*

*'use' of an automobile* for the purpose of determining coverage under the appropriate provisions of a liability insurance policy, it is sufficient to show only that the accident or injury 'was connected with,' 'had its origins in,' 'grew out of,' 'flowed from,' or 'was incident to' the use of the automobile, in order to meet the requirement that there be a causal relationship between the accident or injury and the use of the automobile." (Emphasis added.) Id., 577; see also *Board of Education* v. *St. Paul Fire & Marine Ins. Co.*, 261 Conn. 37, 47–49, 801 A.2d 752 (2002) (relying on *Hogle* in construing phrase in insurance policy providing coverage for injury that results from "use of a covered automobile" [internal quotation marks omitted]). Our case law also imparts a single meaning to the phrase "use of an automobile": " ' "Use" is to be given its ordinary meaning. It denotes the employment of the automobile for some purpose of the user.' . . . 'One may "use" an automobile without personally operating it, as the term use is broader than operation.' " (Citation omitted.) *Aetna Life & Casualty Co.* v. *Bulaong,* 218 Conn. 51, 63, 588 A.2d 138 (1991); see also id., 60–63 (construing term "use" in insurance policy). Because our case law gives each relevant term a single meaning—albeit an expansive one—there is no ambiguity in a policy exclusion that provides that "[c]overage [for] [p]ersonal [l]iability and . . . [m]edical [p]ayments to [o]thers do[es] not apply to 'bodily injury' or 'property damage' . . . [a]rising out of . . . [t]he . . . use . . . of motor vehicles . . . ."

The foregoing provision being unambiguous, we must construe it according to its natural and ordinary meaning and determine whether the provision so construed encompasses the injuries that Dzhgalian and Melikyan sustained as a result of their prolonged exposure to carbon monoxide while guests at Nantes' home. At issue, then, is whether those injuries were connected with, had their origins in, grew out of, flowed from, or

were incident to the employment of the automobile for some purpose of its user. See *Aetna Life & Casualty Co.* v. *Bulaong,* supra, 218 Conn. 63; *Hogle* v. *Hogle,* supra, 167 Conn. 577.

The defendants do not seriously dispute that Dzhgalian's and Melikyan's injuries arose out of Nantes' act of leaving her car running in the garage because those injuries obviously were connected with that act. The defendants claim, rather, that leaving a car in one's garage does not constitute the use of a motor vehicle. We disagree. When Nantes drove into the garage, exited the car and left it there upon entering the house, she was parking the car. Parking is plainly an employment of a car for some purpose of the user. Moreover, the act of parking does not fail to be an employment of a car for some purpose of the user merely because the user performs the act negligently, as Nantes did by exiting the car without turning it off.

The defendants urge us to adopt a narrower construction of the term "use" for the purpose of determining what constitutes the use of a car. Specifically, the defendants assert that a motor vehicle is in use only when "transport[ing] persons and objects from point A to point B," not when parked in a garage. In support of this limited construction, the defendants rely on several principles, namely, that insurance policy exclusions should be read narrowly; e.g., *Heyman Associates No. 1* v. *Ins. Co. of Pennsylvania,* 231 Conn. 756, 770, 653 A.2d 122 (1995); that insurance policies should be construed in favor of the insured; e.g., *Dickinson* v. *Maryland Casualty Co.,* 101 Conn. 369, 378–79, 125 A. 866 (1924); and that policy language must be interpreted so as to reflect the understanding of an ordinary policyholder. See, e.g., *Cody* v. *Remington Electric Shavers,* 179 Conn. 494, 497, 427 A.2d 810 (1980). The foregoing cases establish that these principles of insurance law, although sound, apply only when a policy is ambigu-

ous.[14] Because the language at issue in Nantes' policy is not ambiguous, we do not construe the phrase "use . . . of motor vehicles" narrowly. Instead, we construe the phrase according to its natural and ordinary meaning, as revealed by common usage and by our case law. As we explained, this meaning is not limited to transportation. Rather, it encompasses any employment of the motor vehicle for some purpose of the user. Transportation is one purpose for which a user might employ a motor vehicle, and parking is another.[15]

Alternatively, the defendants contend that, even if the injuries that Dzhgalian and Melikyan sustained as a result of their exposure to carbon monoxide did arise out of the use of a motor vehicle within the meaning of the motor vehicle exclusion of Nantes' homeowner's insurance policy, the doctrine of concurrent causes brings their injuries within the scope of coverage. As one court has explained, "[t]he independent concurrent cause rule operates to extend coverage to a loss caused by the insured risk even though the excluded risk is a contributory cause, [when] a policy expressly insures against loss caused by one risk but excludes loss caused by another risk. . . . The independent concurrent cause must provide the basis for a cause of action in and of itself and must not require the occurrence of the excluded risk to make it actionable." (Citation omitted; internal quotation marks omitted.) *Estate of Jones* v. *Smith*, 320 Wis. 2d 470, 475–76, 768 N.W.2d 245 (App.), review denied, 321 Wis. 2d 49, 775 N.W.2d 255 (2009). The defendants maintain that, because a concurrent

[14] The defendants also propound the principle that language in an insurance policy exclusion must be interpreted more narrowly than identical language in a grant of coverage. The defendants cite no Connecticut authority in support of this principle. More important, they cite no authority indicating that the principle applies even when the language at issue is unambiguous.

[15] In this connection, we note that the defendants offer no persuasive explanation why an ordinary policyholder would understand the phrase "use of a motor vehicle" to apply only to transportation and not to parking.

cause of Dzhgalian's and Melikyan's injuries was Nantes' act of closing the garage door, and because this act was a covered event, the injuries are covered by the policy.

We need not resolve the question of whether Nantes' closing of the garage door was a concurrent cause of Dzhgalian's and Melikyan's injuries. Indeed, for present purposes, we also need not resolve the more fundamental question of whether the doctrine of concurrent causes is a doctrine recognized under this state's common law. We need not reach these questions because this case is controlled by our holding in *Hogle* v. *Hogle,* supra, 167 Conn. 572.[16]

In *Hogle,* we interpreted a homeowner's insurance policy that contained a motor vehicle exclusion substantially identical to the exclusion at issue here. See id., 575. We concluded that the policy did not cover injuries that a passenger in a motor vehicle sustained when the driver's dog leaped from the rear seat to the front seat and caused the driver to lose control of the vehicle. Id., 574, 576–79. We reasoned that the insurer's "obligation to pay the judgment rendered in favor of [the passenger] does not depend on whether it was [the driver's] negligent operation of the car, or the activities of his dog inside the car, which constituted the 'proximate cause' of the accident, and, consequently, of [the passenger's] injuries, as [the driver] contends. Such obligation, rather, depends . . . on another fact, namely, whether [the driver's] 'use' of his car was con-

---

[16] We note that the defendants do not ask us in their brief to this court to overrule *Hogle.* Although the defendants suggested at oral argument that we might overrule a portion of this court's holding in *Hogle,* we decline to consider whether to overrule *Hogle* or any portion thereof, in accordance with our practice of declining to consider claims raised for the first time at oral argument. See, e.g., *Rapoport* v. *Zoning Board of Appeals,* 301 Conn. 22, 40 n.16, 19 A.3d 622 (2011) ("[i]t is well settled that claims on appeal must be adequately briefed . . . and cannot be raised for the first time at oral argument before the reviewing court" [internal quotation marks omitted]).

nected with the accident or the creation of a condition that caused the accident." Id., 578.

The present case, like *Hogle*, involves injuries that stem from two causes, one falling within the exclusion, that is, Nantes' act of leaving her car running in the garage, and the other arguably falling outside the exclusion, that is, Nantes' act of closing the garage door. If we were to accept the defendants' argument and extend coverage to Dzhgalian's and Melikyan's injuries on the ground that a contributing cause of those injuries falls outside the exclusion, we would be required to repudiate our reasoning in *Hogle*, in which we deemed it dispositive that the driver's " 'use' of his car was connected with the [injury] or the creation of a condition that caused [it]." Id. We deemed it irrelevant that a covered event—the dog's leaping into the front seat—was a contributing cause of the passenger's injury. Here, too, it is irrelevant that an arguably covered event—Nantes' closing of the garage door—was a contributing cause of Dzhgalian's and Melikyan's injuries. Consistent with our reasoning in *Hogle*, the fact that Nantes' use of her motor vehicle was connected to or created a condition that caused Dzhgalian's and Melikyan's injuries is enough to bring them within the motor vehicle exclusion.

Finally, the defendants contend that the bodily injuries that Dzhgalian and Melikyan sustained when Nantes dragged them out of the house (dragging injuries) do not fall within the policy's motor vehicle exclusion because they neither arose out of nor were causally connected to the use of a motor vehicle. The defendants contend, rather, that Nantes' act of dragging Melikyan and Dzhgalian out of the house was an act "separate and independent from the carbon monoxide incident."

Contrary to the defendants' claim, Dzhgalian's and Melikyan's dragging injuries arose out of the use of a motor vehicle because Nantes' negligent act of leaving

her car running in the garage was the proximate cause of those injuries. Ordinarily, if an actor's negligent conduct puts another person in peril, that conduct is deemed to be the proximate cause of any injuries negligently inflicted by a foreseeable rescuer. See 2 Restatement (Second), Torts §§ 445, 447 (1965); W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 44, pp. 307–308. This is true whether the rescuer is a third person or the actor herself. In the present case, it was eminently foreseeable that Nantes or a third person might attempt to extricate Dzhgalian and Melikyan from the peril created by Nantes' negligent act of leaving her car running in the garage. Accordingly, Nantes' negligent act was the proximate cause of Dzhgalian's and Melikyan's dragging injuries. Because Nantes' negligent act of leaving her car running in the garage was the proximate cause of Dzhgalian's and Melikyan's dragging injuries, it follows that those injuries arose out of her use of the car. As we explained in *Hogle*, for "an injury to be said to 'arise out of' the 'use' of an automobile . . . it is sufficient to show only that the . . . injury 'was connected with,' 'had its origins in,' 'grew out of,' 'flowed from,' or 'was incident to' the use of the automobile, in order to meet the requirement that there be a causal relationship between the . . . injury and the use of the automobile." *Hogle* v. *Hogle*, supra, 167 Conn. 577. "Under this [expansive] standard of causation, it need not be shown that the incident in question was proximately caused by the vehicle . . . ." *Board of Education* v. *St. Paul Fire & Marine Ins. Co.*, supra, 261 Conn. 48. Because the dragging injuries are linked to Nantes' use of her vehicle under the more demanding standard of proximate causation, those injuries necessarily also meet the less stringent standard of mere "connect[ion] with" Nantes' use of her vehicle. *Hogle* v. *Hogle*, supra, 577.

The judgment is affirmed.

In this opinion the other justices concurred.